UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOHN BOROVICKA,

                                        Plaintiff,

v.                                                        3:13-CV-00969
                                                              (LEK/TWD)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.
_____

APPEARANCES:                                OF COUNSEL:

LACHMAN & GORTON                     PETER A. GORTON, ESQ.
*Counsel for Plaintiff*
P.O. Box 89
1500 East Main Street
Endicott, New York 13761-0089


OFFICE OF GENERAL COUNSEL           JEREMY A. LINDEN, ESQ.
Social Security Administration
Office of Regional General Counsel, Region II
26 Federal Plaza, Room 3904
New York, New York 10278

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the

Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. §

636(b) and Northern District of New York Local Rule 72.3. This case has proceeded in

accordance with General Order 18 of this Court which sets forth the procedures to be followed

when appealing a denial of Social Security benefits. Both parties have filed briefs. Oral

argument was not heard. For the reasons discussed below, it is recommended that this matter be

remanded to the Commissioner.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. Background

Plaintiff is thirty-four years old. (T. at 30.[1]) Plaintiff graduated from the twelfth grade in 1988 and joined the military from 1988 to 1991 as a heavy equipment operator in the Gulf War. (T. at 31, 41, 45.) Plaintiff served in the military again from 1997 to 1998. (T. at 211.) Plaintiff testified that his working disability arose from being in the military. (T. at 31.) During his first tour he was charged with insubordination and during his second tour he was charged with disorderly conduct after drinking and becoming out of control. (T. at 211.) In 1998, Plaintiff was hospitalized for a suicide attempt. *Id.* In 2008, Plaintiff overdosed on medication twice and claimed he was "depressed, with frequent crying, [had] difficulty sleeping, excessive irritability and loss of appetite." *Id.*

After an honorable discharge from the military, Plaintiff took a number of jobs that he could not remember at the time of his hearing. (T. at 35.) Plaintiff testified that he most likely held ten jobs in the last ten to fifteen years. *Id.* Plaintiff's longest job after his military service was at a plumbing company, Mr. Rooter Plumbing, where he was fired after three years of full-time work for getting into a physical altercation with his boss. (T. at 34-35.) Plaintiff testified that he had held positions at two other plumbing companies and for a contractor as a heavy equipment operator. (T. at 34, 43.) He was either fired or he quit his job at Water Works

---

[1]

Citations to page numbers in the administrative transcript refer to the bates stamped numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

because of a dispute with the owner, and at Drain Masters because of an altercation while working.  (T. at 34.)  Plaintiff claimed that "[e]very single job has ended like that."  (T. at 35.)  These jobs usually only lasted weeks.  (T. at 34.)

At the time of the hearing, Plaintiff was employed at Sears delivering appliances.  (T. at 31.)  He worked two days a week for eight hours each day.  (T. at 32.)  On these days, Plaintiff spent most of his time in a delivery truck with one other Sears employee.  (T. at 32-33.)  Plaintiff had missed four days of work in three months due to "severe agitation" and "emotional problems."  (T. at 31-32.)  He claims that he is "angry, depressed, very unmotivated" at the end of each work week.  (T. at 32.)

On June 3, 2010, Plaintiff was examined by psychologist Dr. Gail Oswald in order to determine whether Plaintiff's claimed anxiety and depression were related to his military service.  (T. at 208-09.)  Dr. Oswald noted that Plaintiff's primary care physician was currently prescribing him antidepressants, that he showed signs of obsessive/ritualistic behavior, had infrequent thoughts of suicide, had angry outbursts two to three times a week, and suffers moods that "result in poor motivation and/or irritability that interferes with most activities to some extent."  (T. at 213-216.)  Dr. Oswald concluded that Plaintiff's "claimed depression [was] a progression of his in service psychiatric treatment" and that "his . . . symptoms [were] most likely a progression of the mental disorder for which he was first treated while he was in the military service."  (T. at 219.)

On September 2, 2010, Plaintiff underwent a psychiatric evaluation by psychologist Sara Long, Ph.D.  (T. at 232.)  Dr. Long noted that Plaintiff was "generally hostile throughout the evaluation" but was "capable of adequate social skills."  (T. at 233.)  During the evaluation,

Plaintiff "[did] not present as depressed," but Dr. Long listed the obsessive-compulsive disorder ("OCD") symptom of anger. (T. at 234.) Dr. Long described Plaintiff's psychiatric problems as possibly interfering with his ability to function on a regular basis, and ultimately diagnosed Plaintiff with impulse control disorder and OCD, without ruling out posttraumatic stress disorder and dysthymic disorder. (T. at 235.) On the same day, Plaintiff was also examined by Dr. Justine Magurno, a medical doctor, for a physical examination. (T. at 237-240.) Dr. Magurno diagnosed Plaintiff with hypertension, tobacco abuse, and obesity, and acknowledged his history of depression, anxiety, and OCD. (T. at 239.) Dr. Magurno identified no physical limitations. *Id.*

On September 13, 2010, a psychiatric review was completed by T. Harding, Psychology. (T. at 241-259.) This review categorized Plaintiff's mental issues as anxiety-related disorders and personality disorders, specifying OCD and impulse control disorder. (T. at 241, 246, 248). Plaintiff's functional limitations included a mild degree of limitation on his activities of daily living, a moderate degree of limitation in maintaining social functioning, a moderate degree of limitation in maintaining concentration, persistence or pace, and one or two repeated episodes of deterioration of extended duration. (T. at 251.) Harding determined that Plaintiff's understanding and memory were not significantly limited. (T. at 255.) However, Plaintiff was moderately limited in sustained concentration and persistence in his ability to maintain attention and concentration for extended periods, his ability to sustain an ordinary routine without special supervision, his ability to work in coordination with or proximity to others without being distracted by them, and his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without

an unreasonable number and length of rest periods.  (T. at 255-256.)  Plaintiff's social

interactions were also moderately limited in his ability to interact appropriately with the general

public, his ability to accept instructions and respond appropriately to criticism from supervisors,

and his ability to get along with coworkers or peers without distracting them or exhibiting

behavioral extremes.  (T. at 256.)  Plaintiff was not significantly limited in any other areas.  (T. at

255-256.)  Finally, Plaintiff's adaptation skills were moderately limited in the ability to respond

appropriately to changes in the work setting and the ability to set realistic goals or make plans

independently of others.  (T. at 256.)  Harding noted that Plaintiff's disorders supported "an

impairment that would limit the claimant to being able to perform work where there would be

limited and superficial contact with others," but that Plaintiff's allegations were not credible "to

the degree that would prevent the claimant from being able to work under the [specified]

limitations."  (T. at 257.)

Plaintiff then began regularly seeing his treating psychiatrist, Dr. Robert B. Webster, at a

Veterans Affairs ("VA") hospital starting November 16, 2010.  (T. at 313-316.)  Plaintiff has

seen Dr. Webster nine times after his initial examination.  (T. at 280-282, 284-292, 294-297, 299-

302, 304-310, 313-318.)  Plaintiff described that he wished to transfer from his previous

psychiatrist, Dr. Tohtz, whom he saw for depression, anxiety, OCD, and anger, because Plaintiff

was not satisfied with how Dr. Tohtz "comes across," citing that "he [did] not care, he tells

[Plaintiff] how [he] feels."  (T. at 313.)  Plaintiff also began regularly seeing a therapist/social

worker, Carol Mion, in September 2010.  (T. at 279-280, 282-283, 292-294, 297-299, 302-304,

310-313, 317-318.)

On November 16, 2010, at Plaintiff's initial examination, Dr. Webster assessed that

Plaintiff had "[m]ajor depressive disorder, recurrent, mild." (T. at 313, 316.) On December 22, 2010, Dr. Webster examined Plaintiff for medication management and supportive therapy. (T. at 309.) At the beginning of the session, Plaintiff stated that he "was okay till [he] came to the clinic" because, unexpectedly, the new clinic clerk at the front desk was his ex-wife. *Id.* Plaintiff had just discovered from his ex-wife's daughter that his ex-wife had a son by Plaintiff, whom she had not told Plaintiff about. *Id.* Dr. Webster described Plaintiff as "[c]ooperative, calm and pleasant" and without "psychomotor agitation or retardation." (T. at 310.) Plaintiff had "linear and logical" thought processes, his speech was "spontaneous, relevant, and coherent," and he had fair insight and intact judgment. *Id.*

On January 26, 2011, Dr. Webster described Plaintiff's grooming, dress, disposition, mood, speech, thought processes, insight, and judgment as normal, just as he had done in the prior examination. (T. at 304, 306.) Dr. Webster again described Plaintiff as suffering "major depressive disorder, recurrent, mild" and included "Cluster B traits (borderline, antisocial)." (T. at 306.)

On March 9, 2011, Plaintiff detailed an episode of anger to Dr. Webster. (T. at 299, 300.) Plaintiff had gotten upset at the Broome County Family Court, "punch[ed] a table, and picked up a chair and thr[e]w it against a wall." (T. at 300.) Again, Dr. Webster described Plaintiff's grooming, dress, disposition, mood, speech, thought processes, insight, and judgment as normal, and noted "major depressive disorder, recurrent, mild" with "Cluster B traits (borderline, antisocial)." (T. at 300-01.)

On May 4, 2011, Dr. Webster noted that Plaintiff reported he "[had] been doing better since last visit." (T. at 296.) Plaintiff said he was "calmer, less agitated . . . sleeping better," and

"less irritab[le]."  *Id.*  Again, Dr. Webster described Plaintiff's grooming, dress, disposition, mood, speech, thought processes, insight, and judgment as normal, and noted "major depressive disorder, recurrent, mild" with "Cluster B traits (borderline, antisocial)."  (T. at 297.)

On June 9, 2011, Dr. Webster noted that Plaintiff reported that "his agitation has been 'not as much.'"  (T. at 294.)  Plaintiff also reported "a depressed mood, some anhedonia and decrease in ambition," as well as suffering anxiety the day before the appointment for the first time "in a while."  *Id.*  Again, Dr. Webster described Plaintiff's grooming, dress, disposition, mood, speech, thought processes, insight, and judgment as normal, and noted "major depressive disorder, recurrent, mild" with "Cluster B traits (borderline, antisocial)."  (T. at 295.)

On July 14, 2011, Dr. Webster noted that Plaintiff reported his medication was helping him to feel "normal . . . feel better, more ambition."  (T. at 288, 289.)  Plaintiff further denied he was in a depressed mood or had increased irritability.  (T. at 289.)  Again, Dr. Webster described Plaintiff's grooming, dress, disposition, mood, speech, thought processes, insight, and judgment as normal, and noted "major depressive disorder, recurrent, mild" with "Cluster B traits (borderline, antisocial)."  (T. at 290.)

On September 15, 2011, Dr. Webster noted that Plaintiff reported that his mood had been "'pretty good'" and that he was not getting as irritable as he previously had.  (T. at 285, 286.)  Plaintiff further denied a depressed mood and increased irritability or anhedonia.  (T. at 286.)  Again, Dr. Webster described Plaintiff's grooming, dress, disposition, mood, speech, thought processes, insight, and judgment as normal, and noted "major depressive disorder, recurrent, mild" with "Cluster B traits (borderline, antisocial)."  (T. at 295.)

On November 16, 2011, Dr. Webster noted that Plaintiff reported he was "a little

frustrated and worried about his social security disability hearing" but was doing "fairly well in general since [his] last visit." (T. at 284.) Plaintiff further reported he had started a job at Sears and that he only got irritable at work. *Id.* He stated that "he is most likely not going to keep his job because it requires heavy lifting." *Id.* Plaintiff reported he "intermittently gets depressed about life, work, finances and his children," but denied anedonia. *Id.* Again, Dr. Webster described Plaintiff's grooming, dress, disposition, mood, speech, thought processes, insight, and judgment as normal, and noted "major depressive disorder, recurrent, mild" with "Cluster B traits (borderline, antisocial)." (T. at 285.)

At Plaintiff's most recent appointment with Dr. Webster on December 12, 2011, Dr. Webster noted that Plaintiff reported he had "medium to marked impairment" in functioning for work activities and concentration. (T. at 280.) Again, Dr. Webster described Plaintiff's grooming, dress, disposition, mood, speech, thought processes, insight, and judgment as normal, and noted "major depressive disorder, recurrent, mild" and included "Cluster B traits (borderline, antisocial)." (T. at 281.) At this appointment, Dr. Webster also completed a questionnaire-mental form from Lachman & Gorton relating to Plaintiff's application for Social Security Disability. (T. at 266-268, 280.) Within this form, Dr. Webster noted that Plaintiff had no extreme impairments, but had marked impairments in a number of areas, including his ability to: perform activities within a schedule, maintain regular attendance and/or be punctual within customary tolerances; sustain ordinary routine without special supervision; complete a normal work day and work week without interruptions from psychological based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism

from supervisors; respond appropriately to ordinary stressors in the work setting; and respond appropriately to changes in the work setting. (T. at 266-267.) Plaintiff had a medium limitation in his ability to: maintain attention and concentration for extended periods of time and get along with co-workers or peers without distracting them or exhibiting behavoral extremes. *Id.* Dr. Webster also noted that Plaintiff was likely to miss more than three days of work per month due to his depression. (T. at 267.) This diagnosis was based on Plaintiff's "major depressive disorder–associated with depressed mood, irritability, anger, trouble sleeping, lack of motivation, impaired concentration, poor energy, loss of interest, [and] suicidal ideation." (T. at 267.)

On December 5, 2011, Plaintiff was examined once by Dr. Mary Ann Moore for an independent psychological and intellectual assessment at the Broome County Department of Social Services. (T. at 270-277.) Dr. Moore indicated Plaintiff was normal in general appearance, speech and language, thought process, and cognitive function. (T. at 273.) Dr. Moore indicated that Plaintiff was abnormal in mood, affect, orientation, attention and concentration, and remote memory skills, insight, and judgment. *Id.* Further details included Plaintiff had a flat mood, restricted affect, and fair to poor judgment "with consistent mood swings and extreme . . . outbursts with depression," as well as appropriate speech and language, a coherent and goal direct thought process, and an average range of cognitive functioning. *Id.* Dr. Moore interpreted the tests to suggest that Plaintiff was in the deficient range, suggesting "deficiencies in regard to adaptive behaviors," "daily living skills including completion of cooking, cleaning, laundry, and personal care," interpersonal relationships, and coping skills. (T. at 274.) Ultimately, Dr. Moore found that Plaintiff appeared permanently disabled with his condition not expected to improve. (T. at 276.) Further, Dr. Moore indicated that Plaintiff would

9

be unable to work for more than six months due to his mental health condition. *Id.* She noted her opinion did not differ from that of the treating physician, Dr. Webster. (T. at 277.)

## B. Procedural History

Plaintiff alleges disability due to depression. (T. at 101-102.) Plaintiff applied for disability insurance benefits on July 27, 2010. (T. at 101.) The application was denied on September 15, 2010. (T. at 48-51.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (T. at 54-55.) The hearing was held on December 23, 2011. (T. at 26-45.) On March 30, 2012, the ALJ issued a decision finding that Plaintiff was not disabled. (T. at 7-19.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on July 18, 2013. (T. at 1-4.) Plaintiff commenced this action on August 13, 2013. (Dkt. No. 1.)

## II. APPLICABLE LAW

### A. Standard for Benefits

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2012). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. §§ 405(a), 1383(d)(1)), the Social Security Administration ("SSA") promulgated regulations establishing a five-step sequential evaluation process to determine disability. 20 C.F.R. § 416.920(a)(4) (2015). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

> At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do basic work activities." [20 C.F.R.] §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [20 C.F.R.] §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. [20 C.F.R.] §§ 404.1520(f), 404.1560(c), 416.920(f), 416.9630(c).

*Thomas*, 540 U.S. at 24-25 (footnotes omitted).

The plaintiff-claimant bears the burden of proof regarding the first four steps. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). If the plaintiff-claimant meets his or her burden of proof, the burden shifts to the

defendant-Commissioner at the fifth step to prove that the plaintiff-claimant is capable of working. *Id.*

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Featherly v. Astrue*, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted); *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citations omitted). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "[A]n ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." *Roat v. Barnhart*, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010); *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . .'" *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "'more than a mere scintilla'" of evidence scattered throughout the administrative record. *Featherly*, 793 F. Supp. 2d at 630; *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides,

because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citations omitted). However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972); *see also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## III. THE ALJ'S DECISION

Here, the ALJ found that: (1) Plaintiff met the insured status requirements of the Social Security Act through March 31, 2016 (T. at 12); (2) Plaintiff "was not engaged in substantial gainful activity since December 31, 2009, the alleged onset date" (T. at 12); (3) Plaintiff's depression is a "severe" impairment, but not his claimed anxiety, OCD, anger problems, trouble sleeping, nightmares, posttraumatic stress disorder, and high blood pressure (T. at 12-13); (4) Plaintiff's impairments do not rise to the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526) (T. at 14); (5) Plaintiff has the residual functional capacity ("RFC") "to perform a full range of work at all exertional levels," including the mental ability "to perform simple and complex work in a low stress environment, which is defined as only occasional contact with co-workers, supervisors, and the public, occasional decision making directly related to performance of work, and occasional changes in the work environment" (T. at 14); (6) Plaintiff is unable to perform any past relevant work (T. at 18); (7) Plaintiff was a "younger individual" on the onset date (T. at 18); (8) Plaintiff has at least a high school education and is able to communicate in English (T. at 18); (9) Plaintiff's transferability of job skills is not material to the disability determination because the Medical-Vocational Rules demonstrate that Plaintiff is not disabled (T. at 18); and (10) Plaintiff's

age, education, work experience, and RFC support a finding that "there are jobs that exist in significant numbers in the national economy that the claimant can perform" (T. at 18).

## IV.    THE PARTIES' CONTENTIONS

Plaintiff makes the following claims:

(1) The ALJ's RFC assessment of Plaintiff is not supported by substantial evidence because the ALJ failed to give the treating physician, Dr. Webster, the proper weight under the treating physician rule.  (Dkt. No. 13 at 9-17.[2])

(2) The ALJ failed to consider Plaintiff's inability to engage in substantial gainful activity as understood as regular and systematic employment.  (Dkt. No. 13 at 17-20.)

(3) The ALJ failed to obtain testimony from a vocational expert ("VE") and relied solely on the Medical-Vocational Guidelines at Step Five.  (Dkt. No. 13 at 20-23.)

Defendant contends that the ALJ's decision applied the correct legal standards and is supported by substantial evidence and thus should be affirmed.  (Dkt. No. 16.)

## V.    DISCUSSION

### A.    The ALJ failed to give the assessments of Plaintiff's treating physician proper weight.

Plaintiff argues that the ALJ erroneously determined Plaintiff's RFC because the ALJ did not give the assessments done by Plaintiff's treating physician, Dr. Webster, the proper weight. (Dkt. No. 13 at 9-17.)  As discussed below, the ALJ did not give "good reasons" for the weight given to Plaintiff's treating physician and therefore did not rely on substantial evidence.

---

[2]    Citations to page numbers in Plaintiff's brief refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

The medical opinions of a treating physician are given "controlling weight" as long as they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are not inconsistent with other substantial evidence contained in the record. 20 C.F.R. § 404.1527(c)(2) (2015).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citation omitted). These factors include: (1) the length of the treatment relationship and frequency of examinations; (2) the nature and extent of treatment relationship; (3) the medical evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)-(6).

The Regulations require the Commissioner's notice of determination or decision to "give good reasons" for the weight given a treating source's opinion. 20 C.F.R. § 404.1527(c)(2). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir. 1999); *Halloran,* 362 F.3d at 32-33.

Because the ALJ did not give controlling weight to Plaintiff's treating physician, he should have considered the above factors in order to provide "good reasons" for giving Dr. Webster's assessment only limited weight. Instead, the ALJ merely claimed that "Dr. Webster's assessment is given limited weight because it is not substantiated by treatment notes from his office" and because "Dr. Webster's treatment notes do not support the significant limitations he

identified." (T. at 15-16.)

Dr. Webster treated Plaintiff on ten occasions from November 16, 2010, to December 12, 2011. (T. at 280-282, 284-292, 294-297, 299-302, 304-308-310, 313-318.) Dr. Webster assessed Plaintiff at least every other month, usually for thirty minute appointments, for a year. *Id.* The ALJ did not consider this in his decision.

Dr. Webster was Plaintiff's treating psychiatrist after Plaintiff wished to transfer from his prior psychiatrist because, as he claimed, "I am not happy seeing Dr. Tohtz. I've seen Dr. Tohtz four times. I'm not happy how he comes across, he does not care, he tells me how I feel." (T. at 313.) On the other hand, Plaintiff continued with Dr. Webster for at least the next year.

Dr. Webster's regular treatment notes from November 2010 to December 2011 support Dr. Webster's questionnaire-mental form dated December 11, 2011. (T. at 266-268.) Dr. Webster noted that Plaintiff had "marked" limitations in many assessed areas including his ability: to perform activities within a schedule, maintain regular attendance and/or be punctual within in customary tolerances; to sustain ordinary routine without special supervision; to complete a normal work day and work week without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to respond appropriately to ordinary stressors in the work setting; and to respond appropriately to changes in the work setting. (T. at 266-267.) Dr. Webster also noted "medium" limitations (meaning, more than a slight but less than a serious limitation in this area) in Plaintiff's ability to maintain attention and concentration for extended periods of time and get along with co-workers or peers without distracting them or exhibiting

16

behavioral extremes. *Id.* Further, Dr. Webster indicated that Plaintiff's symptoms and treatment would reasonably be expected to cause more than three absences from work per month. (T. at 267). In Dr. Webster's opinion, all of these limitations were due to Plaintiff's "major depressive disorder–associated with depressed mood, irritability, anger, trouble sleeping, lack of motivation, impaired concentration, poor energy, lass of interest, [and] suicidal ideation." *Id.*

Dr. Webster's treatment notes from November 2010 to December 2011 support this assessment. Defendant argues that Dr. Webster "regularly found that plaintiff was alert, fully oriented, cooperative, calm, pleasant, and fairly-well-to-well groomed, with casual appearance, no psychomotor agitation or retardation, no abnormal involuntary movements, normal speech that was relevant and coherent, linear and logical thought processes, no hallucinations or delusions, no impairment in self perception, no suicidal or homicidal ideation, intact immediate, recent, and remote memory, intact cognitive functioning, intact abstraction, fair/intact insight, and intact judgment . . . . [and] Dr. Webster . . . indicated that the Plaintiff's GAF improved with treatment over time. (Dkt. No. 16 at 7-8.) While Dr. Webster's notes do in fact make these indications, Dr. Webster also made regular assessments of Plaintiff's recurrent major depressive disorder (T. at 285, 286, 290, 295, 297, 301, 306, 316), constricted affect (T. at 281, 285), significant anger and frustration problems at work and elsewhere (T. at 296, 298, 300), agitation (T. at 316), irritability (T. at 284), depressed mood (T. at 286, 294, 305), anhedonia (T. at 294), decreased ambition (T. at 294), sleep problems (T. at 305), anxiety (T. at 294), and lack of motivation (T. at 281). The ALJ failed to take into consideration the full range of Dr. Webster's treating notes, including those in support of his medical source opinion. *See* T. at 266-268.

Dr. Webster's opinion is also consistent with other assessments from Plaintiff's medical

records as a whole, including assessments of Plaintiff by Dr. Gail Oswald, Dr. Sara Long, Dr. Justine Magurno, T. Harding, Psychology, Dr. Carol Mion, and Dr. Mary Ann Moore.  Dr. Webster's findings in his questionnaire-mental form (T. at 266-268) are substantiated by the findings of these assessments.  The VA treatment notes from Dr. Oswald's examination indicate that Plaintiff suffered depression, showing twelve severe depressive symptoms (T. at 210), was fired on multiple occasions because of his anger and abusive behavior (T. at 217), suffered sleep impairment due to his depression (T. at 214), and had reduced reliability and productivity at work due to his depression (T. at 218.[3])  Dr. Long described Plaintiff as "generally hostile throughout the evaluation," "presented as generally angry," and described that his psychiatric problems "may interfere with his ability to function on a regular basis."  (T. at 230-236.)  Dr. Magurno, a medical doctor who merely examined Plaintiff's physical abilities, found that Plaintiff had no physical limitations.  (T. at 237-240.)  T. Harding categorized Plaintiff's mental issues as anxiety-related disorders and personality disorders that caused mild and moderate limitations in a number of areas. (T. at 251-258.)  Harding noted that Plaintiff's disorders supported "an impairment that would limit the claimant to being able to perform work where there would be limited and superficial contact with others," but that Plaintiff's allegations were not credible "to the degree that would prevent the claimant from being able to work under the [specified] limitations."  (T. at 257.)  Carol Mion, Plaintiff's treating therapist, examined Plaintiff eight times during the same time frame as Dr. Webster.  (T. at 279-280, 282-283, 292-294, 297-299, 302-304, 310-313, 317-

---

[3]
    Although Dr. Oswald noted that Plaintiff had reduced reliability and productivity at work, she also indicated that Plaintiff's mental disorder did not cause total occupational impairment and did not result in deficiencies in work.  (T at 218.)

322.)  Dr. Mion indicated many of the same symptoms–both positive and negative–as Dr.

Webster, but the ALJ does not cite Dr. Mion's findings once in his decision.  She diagnosed

Plaintiff first with depression, then adjustment reaction with mixed disturbance of emotions and

conduct, and finally with major depressive disorder.  (T. at 279, 293, 298, 312, 303, 318.)  She

also noted Plaintiff's sleep problems (T. at 317), anger (T. at 282, 292, 311, 317), lack of

ambition (T. at 282, 302), and lack of motivation (T. at 279).  Dr. Moore's assessment, which

included only one examination, also supported Dr. Webster's opinion in that Dr. Moore indicated

Plaintiff had a flat mood, restricted affect, impaired attention and concentration, impaired remote

memory skills, and abnormal insight and judgment.  (T. at 273.)  Ultimately, Dr. Moore found

that Plaintiff appeared permanently disabled with his condition not expected to improve.  (T. at

276.)  Further, Dr. Moore indicated that Plaintiff would be unable to work for more than six

months due to his mental health condition.  *Id.*  She noted her opinion did not differ from that of

the treating physician, Dr. Webster.  (T. at 277.)

As a psychiatrist, Dr. Webster is a specialist in mental health issues and depression.

The ALJ did not take these factors into consideration when determining the proper weight

to give to Dr. Webster's assessment of Plaintiff.  In the absence of "good reasons" for giving Dr.

Webster's opinion "limited weight," substantial evidence does not support the ALJ's findings

regarding Plaintiff's RFC.  Accordingly, remand is appropriate.

**B.**      **The ALJ failed to consider Plaintiff's inability to engage in substantial gainful activity as understood as regular and systematic employment.**

Plaintiff argues that the ALJ failed to consider Plaintiff's absenteeism and inability to

complete a normal workday or workweek in determining whether Plaintiff could engage in

substantial gainful activity. (Dkt. No. 13 at 17-20.) In Step One of the sequential analysis, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since December 31, 2009. (T at 12.) However, it appears that Plaintiff is arguing that the ALJ should have considered Plaintiff's inability to retain a job in determining Plaintiff's RFC under Step Four.[4] (Dkt. No. 13 at 20.)

Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (citing *Melville v. Apfel*, 198 F.3d 45, 42 (2d Cir. 1999) (quotations omitted)). A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule. *Id.*

Here, the ALJ found that Plaintiff had the RFC "to perform a full range of work at all exertional levels," and the mental ability "to perform simple and complex work in a low stress environment, which is defined as only occasional contact with co-workers, supervisors, and the public, occasional decision making directly related to performance of work, and occasional changes in the work environment" on a sustained basis. (T. at 14.) The ALJ did not include in his assessment a discussion of Plaintiff's ability to work on a regular and continuing basis. The ALJ looked to the medical evidence as compared with Plaintiff's "statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms." (T. at 14-18.) However,

---

[4]
    Plaintiff does not outright make this argument, but since the ALJ determined that Plaintiff did not work in substantial gainful activity, the Court assumes Plaintiff argues that the ALJ did not consider how Plaintiff's absenteeism affected Plaintiff's RFC.

at no point did the ALJ mention Plaintiff's limited work schedule and past experiences on job

sites as caused by his depression. (T at 14-18.[5]) The ALJ did not include a discussion of the

individual's abilities on a regular and continuing basis, which may affect his ability to engage in

substantial gainful activity. Therefore, the ALJ's RFC determination has not been properly

calculated and it is not supported by substantial evidence. As such, I recommend the case be

remanded for a determination of Plaintiff's RFC which includes a consideration of Plaintiff's

ability to do sustained work activities on a regular and continuing basis.

### C. The ALJ failed to obtain testimony from a VE and relied solely on the Medical-Vocational Guidelines to determine Plaintiff's RFC.

Plaintiff argues that the ALJ erred by failing to consult a VE since his limitation is

nonexertional. (Dkt. No. 13 at 20-22.) Plaintiff is correct.

Where a claimant is able to demonstrate that his or her impairments prevent a return to

past relevant work, the burden shifts to the Commissioner at Step Five to prove that a job exists

in the national economy which the claimant is capable of performing. *See Curry v. Apfel*, 209

F.3d 117, 122 (2d Cir. 2000); 20 C.F.R. §§ 404.1560(c), 416.960(c). In making this

determination, the ALJ may apply the Medical-Vocational Guidelines (the "grids") or consult a

VE. *See Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999). If the claimant's "characteristics

match the criteria of a particular grid rule, the rule directs a conclusion as to whether he [or she]

is disabled." *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996). However, if a claimant suffers

from nonexertional impairments that "significantly limit the range of work permitted by

---

[5]     The ALJ did note that "the claimant is currently employed at Sears, and mental health records confirmed that he works approximately 16 hours a week," as well as confirmed that Plaintiff "testified to verbal and physical disagreements with his co-workers." (T at 17.)

exertional limitations," the ALJ should elicit testimony from a VE to determine if jobs exist in the economy that the claimant can still perform. *Id.* at 39 (quoting *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986)); 20 C.F.R. §§ 404.1566(e), 416.966(e). "The vocational expert may testify as to the existence of jobs in the national economy, and as to the claimant's ability to perform any of those jobs, given his functional limitations." *Colon v. Comm'r of Soc. Sec.*, No. 6:00-CV-0556 (GLS), 2004 U.S. Dist. LEXIS 5125, at *18, 2004 WL 1144059, at *6 (N.D.N.Y. Mar. 22, 2004) (Sharpe, J.).

Here, Plaintiff suffered a nonexertional impairment with moderate and marked limitations in mental functioning, but the ALJ only relied upon the grids in his determination of no disability and did not consult a VE under Step Five. (T at 18-19.) The ALJ noted that "the claimant has solely nonexertional limitations, and they have little or no effect on the occupational base of unskilled work at all exertional levels." (T at 18.) The ALJ made this conclusion of Plaintiff's nonexertional limitations without consulting a VE, despite the findings of treating providers and consultants that Plaintiff had a considerable number of moderate and marked mental limitations. This issue should be remanded so that a VE can be consulted.

**WHEREFORE,** it is hereby

**RECOMMENDED**, that this matter be remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g),[6] for further proceedings consistent with the above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

---

[6]     Sentence four reads "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

written objections to the foregoing report.  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 72.

Dated: February 19, 2015
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge